# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| BRIANNE GLAZIER, individually and on behalf of all others similarly situated, | Case No. _____ |
| Plaintiff, | |
| v. | CLASS ACTION |
| HEALTHCARE SERVICES GROUP, INC., | JURY TRIAL DEMANDED |
| Defendant. | |

## **CLASS ACTION COMPLAINT**

Plaintiff Brianne Glazier ("Plaintiff"), individually, and on behalf of all others similarly situated (collectively, "Class members"), by and through her attorneys, brings this Class Action Complaint against Defendant Healthcare Services Group, Inc. ("HCSG" or "Defendant"), and complains and alleges upon personal knowledge as to herself and information and belief as to all other matters.

## **INTRODUCTION**

1.      Plaintiff brings this class action against Defendant for its failure to secure and safeguard approximately 624,496 individuals', including Plaintiff's, personally identifying information ("PII") and personal health information ("PHI"), including names, Social Security numbers, driver's license or government-issued ID numbers, financial information, medical information, and health insurance information.

2.      HCSG provides dining, environmental, and nutritional services for healthcare communities.

3.      Between approximately September 27 and October 3, 2024, an unauthorized third party gained access to HCSG's network systems and accessed and acquired files containing the

PII/PHI of HCSG's employees and clients' patients, including Plaintiff and Class members (the "Data Breach").

4.      Defendant owed a duty to Plaintiff and Class members to implement and maintain reasonable and adequate security measures to secure, protect, and safeguard their PII/PHI against unauthorized access and disclosure. Defendant breached that duty by, among other things, failing to implement and maintain reasonable security procedures and practices to protect Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure.

5.      As a result of Defendant's inadequate security and breach of its duties and obligations, the Data Breach occurred, and Plaintiff's and Class members' PII/PHI was accessed and disclosed. This action seeks to remedy these failings and their consequences. Plaintiff brings this action on behalf of herself and all persons whose PII/PHI was exposed as a result of the Data Breach, which occurred between approximately September 27 and October 3, 2024.

6.      Plaintiff, on behalf of herself and all other Class members, asserts claims for negligence, breach of implied contract, unjust enrichment, and violations of the Kansas Consumer Protection Act, and seeks declaratory relief, injunctive relief, monetary damages, statutory damages, punitive damages, equitable relief, and all other relief authorized by law.

**PARTIES**

*Plaintiff Brianne Glazier*

7.      Plaintiff is a citizen and resident of Kansas.

8.      Plaintiff previously applied for employment with HCSG and is a patient of a healthcare facility that, upon information and belief, is a client of HCSG. As a condition of providing services to Plaintiff and of applying for employment, HCSG required Plaintiff to provide it with her PII/PHI.

9.      Based on representations made by HCSG, Plaintiff believed that HCSG had implemented and maintained reasonable security practices to protect her PII/PHI. With this belief in mind, Plaintiff provided her PII/PHI to HCSG in connection with applying for employment and in exchange for receiving services from HCSG.

10.      At all relevant times, HCSG stored, shared, and maintained Plaintiff's PII/PHI on its network systems, including the systems impacted in the Data Breach.

11.      Plaintiff received a notice letter from HCSG notifying her that her PII/PHI was in the files accessed and acquired by an unauthorized third party in the Data Breach.

12.      Had Plaintiff known that HCSG does not adequately protect the PII/PHI it collects and maintains, she would not have agreed to provide her PII/PHI to, obtained services, or sought employment from, HCSG.

13.      As a direct result of the Data Breach, Plaintiff has suffered injury and damages including, *inter alia*, a substantial and imminent risk of identity theft and medical identity theft; the wrongful disclosure and loss of confidentiality of her highly sensitive PII/PHI; time and effort lost attempting to mitigate the harm caused by the Data Breach; and deprivation of the value of her PII/PHI.

### *Defendant Healthcare Services Group, Inc.*

14.      Defendant Healthcare Services Group, Inc. is a Pennsylvania corporation with its principal place of business located at 3220 Tillman Drive, Suite 300, Bensalem, PA 19020. It may be served through its registered agent: Corporation Service Company, 5235 North Front Street, Harrisburg, PA 17110.

## JURISDICTION AND VENUE

15.     The Court has subject matter jurisdiction over Plaintiff's claims under 28 U.S.C.

§ 1332(d)(2), because (a) there are 100 or more Class members, (b) at least one Class member is

a citizen of a state that is diverse from Defendant's citizenship, and (c) the matter in controversy

exceeds $5,000,000, exclusive of interest and costs.

16.     This Court has general personal jurisdiction over Defendant because it is organized

under the laws of this State and maintains its principal place of business in this District.

17.     Venue is proper in this Court pursuant to 28 U.S.C. § 1391(b) because Defendant's

principal place of business is in this District and a substantial part of the events, acts, and omissions

giving rise to Plaintiff's claims occurred in this District.

## FACTUAL ALLEGATIONS

### *Overview of HCSG*

18.     HCSG provides "management, administrative, and operating expertise and services

to the housekeeping, laundry, linen, facility maintenance and dietary service departments" of

healthcare facilities.[1] It provides services to over 2,600 facilities across the United States.[2]

19.     In the regular course of its business, HCSG collects and maintains the PII/PHI of

its employees and clients' patients, including Plaintiff and Class members. HCSG requires its

clients' patients to provide it with their PII/PHI, including the information stolen in the Data

Breach, before it provides them services. HCSG requires its employees to provide it with their

PII/PHI, including the PII/PHI stolen in the Data Breach, before it provides them employment.

---

[1]   Healthcare Servs. Grp., Inc., *Annual Report (Form 10-K)* (Feb. 14, 2025), https://d18rn0p25nwr6d.cloudfront.net/CIK-0000731012/2b2ec050-f6f5-4847-964e-c8c26bc8411b.pdf.

[2] *Id.*

20.    In its annual filing with the Securities and Exchange Commission, HCSG admits "any attack perpetrated against our information systems including through a system failure, security breach or disruption by malware or other damage, could similarly impact our operations and result in loss or misuse of information."[3]

21.    HCSG maintains an Information Security Policy (the "Security Policy") that governs its management of IT systems, network, and data.[4] In the Security Policy, HCSG states it is "committed to protecting its information technology systems, network, information, and data assets (collectively, its 'IT System and Assets') from threats and seeks to minimize vulnerabilities to the privacy and security of its IT System and Assets."[5]

22.    In the Security Policy, HCSG represents its policies and practices to "[s]afeguard its IT System and Assets, and data belonging to its customers, vendors, employees, and service providers," "[s]upport the integrity of HCSG's IT System and Assets," and "[s]upport appropriate usage of HCSG's IT System and Assets."[6] HCSG promises it is committed to addressing risks and complying with applicable laws, frameworks, and guidance.[7]

23.    HCSG states compliance with the Security Policy "minimizes the risk of breaches of confidentiality, malicious or accidental corruption of data, and supports [its] ongoing compliance with legal and contractual obligations."[8]

---

[3] *Id.*
[4] *Id.*
[5] *HCSG Information Security Policy*, HCSG CORP., http://q4live.s205.clientfiles.s3-website-us-east-1.amazonaws.com/240025483/files/doc_downloads/gov_docs/HCSG-Information-Security-Policy-Approved-October-24-2023.pdf (last accessed Sept. 5, 2025).
[6] *Id.*
[7] *See id.*
[8] *Id.*

24.     HCSG represents that it maintains a cybersecurity risk prevention program involving employee training and procedures to cybersecurity incident prevention, detection, and response.[9]

25.     Plaintiff and Class members entrusted HCSG with their PII/PHI in exchange for receiving services or employment.

### The Data Breach

26.     Between approximately September 27, 2024, and October 3, 2024, an unauthorized third party gained access to HCSG's network systems and accessed and acquired the PII/PHI of its employees and clients' patients, including their names, Social Security numbers, driver's license or government-issued ID numbers, financial information, medical information, and health insurance information.[10]

27.     Despite discovering the Data Breach on or about October 7, 2024, HCSG waited until approximately August 31, 2025—nearly 11 months after the Data Breach began—to begin notifying Plaintiff and Class members that the Data Breach occurred and that their PII/PHI was accessed and acquired by unauthorized persons.[11]

28.     Defendant acknowledges that the Data Breach places Plaintiff and Class members in imminent danger of fraud and identity theft. The data breach notice letter warns Plaintiff and

---

[9] *Form 10-K*, *supra* note 1.

[10] *See Healthcare Services Group, Inc. Data Breach Notice Letter*, ME. ATT'Y GEN. (Aug. 25, 2025), available at https://www.maine.gov/agviewer/content/ag/985235c7-cb95-4be2-8792-a1252b4f8318/9a82ac2b-5379-462d-acd6-26a3b3bd0b30.html; *Data Security Breach Reports – Healthcare Services Group, Inc.*, OFF. TEX. ATT'Y GEN. (Aug. 26, 2025), https://oag.my.site.com/datasecuritybreachreport/apex/DataSecurityReportsPage.

[11] *See Notice Letter*, *supra* note 10.

Class members "to remain vigilant against incidents of identity theft and fraud" and review their account statements and credit reports for suspicious activity.[12]

29.    On October 25, 2024, the Underground Ransomware gang claimed responsibility for the Data Breach, adding HCSG to its dark web leak website and making the data available to download.[13]

30.    Defendant's failure to promptly notify Plaintiff and Class members that their PII/PHI was disclosed, accessed, and stolen virtually ensured that the unauthorized third parties who exploited those security lapses could monetize, misuse, or disseminate that PII/PHI before Plaintiff and Class members could take affirmative steps to protect their sensitive information. As a result, Plaintiff and Class members will suffer indefinitely from the substantial and concrete risk that their identities will be (or already have been) stolen and misappropriated.

### *Defendant Knew that Criminals Target PII/PHI*

31.    At all relevant times, Defendant knew, or should have known, that the PII/PHI that it collects and stores was a target for malicious actors. Despite such knowledge, Defendant failed to implement and maintain reasonable and appropriate data privacy and security measures to protect Plaintiff's and Class members' PII/PHI from unauthorized disclosures and cyberattacks that it should have anticipated and guarded against.

32.    It is well known among companies that store sensitive personally identifying information that such information—such as the PII/PHI stolen in the Data Breach—is valuable and frequently targeted by criminals. In a recent article, *Business Insider* noted that "[d]ata

---

[12] *Id.*

[13] *See* Paul Bischoff, *Healthcare Services Group notifies 625,000 people of data breach that compromised SSNs, credit cards, and medical info*, COMPARITECH (Aug. 26, 2025), https://www.comparitech.com/news/healthcare-services-group-notifies-625000-people-of-data-breach-that-compromised-ssns-credit-cards-and-medical-info/?utm_source=chatgpt.com.

breaches are on the rise for all kinds of businesses, including retailers . . . . Many of them were caused by flaws in . . . systems either online or in stores."[14]

33.    Cyber criminals seek out PHI at a greater rate than other sources of personal information. In a 2025 report, Kroll found that "the healthcare industry was the most breached" in 2024.[15] The company found that 23% of the breaches that it handled responses for were from the healthcare industry, up from 18% in 2023.[16]

34.    PII/PHI is a valuable property right.[17] The value of PII/PHI as a commodity is measurable.[18] "Firms are now able to attain significant market valuations by employing business models predicated on the successful use of personal data within the existing legal and regulatory frameworks."[19] American companies are estimated to have spent over $19 billion on acquiring personal data of consumers in 2018.[20] It is so valuable to identity thieves that once PII has been disclosed, criminals often trade it on the "cyber black-market," or the "dark web," for many years.

---

[14] Dennis Green, Mary Hanbury & Aine Cain, *If you bought anything from these 19 companies recently, your data may have been stolen*, BUS. INSIDER (Nov. 19, 2019, 8:05 AM), https://www.businessinsider.com/data-breaches-retailers-consumer-companies-2019-1.

[15] *Data Breach Outlook*, KROLL, https://www.kroll.com/en/insights/publications/cyber/data-breach-outlook-2025 (last accessed Sept. 5, 2025).

[16] *See id.*

[17] *See* Marc van Lieshout, *The Value of Personal Data*, 457 Int'l Fed'n for Info. Processing 26 (May 2015) ("The value of [personal] information is well understood by marketers who try to collect as much data about personal conducts and preferences as possible . . ."), https://www.researchgate.net/publication/283668023_The_Value_of_Personal_Data.

[18] *See* Robert Lowes, *Stolen EHR [Electronic Health Record] Charts Sell for $50 Each on Black Market*, MEDSCAPE (April 28, 2014), http://www.medscape.com/viewarticle/824192.

[19] Organization for Economic Co-operation and Development, *Exploring the Economics of Personal Data: A Survey of Methodologies for Measuring Monetary Value*, OECD iLIBRARY (Apr. 2, 2013), https://www.oecd-ilibrary.org/science-and-technology/exploring-the-economics-of-personal-data_5k486qtxldmq-en.

[20] IAB Data Center of Excellence, *U.S. Firms to Spend Nearly $19.2 Billion on Third-Party Audience Data and Data-Use Solutions in 2018, Up 17.5% from 2017*, INTERACTIVE ADVERT. BUREAU (Dec. 5, 2018), https://www.iab.com/news/2018-state-of-data-report/.

35.     As a result of the real and significant value of these data, identity thieves and other cyber criminals have openly posted credit card numbers, Social Security numbers, PII/PHI, and other sensitive information directly on various internet websites making the information publicly available. This information from various breaches, including the information exposed in the Data Breach, can be readily aggregated with other such data and become more valuable to thieves and more damaging to victims.

36.     PHI is particularly valuable and has been referred to as a "treasure trove for criminals."[21] A cybercriminal who steals a person's PHI can end up with as many as "seven to ten personal identifying characteristics of an individual."[22]

37.     All-inclusive health insurance dossiers containing sensitive health insurance information, names, addresses, telephone numbers, email addresses, Social Security Numbers, and bank account information, complete with account and routing numbers, can fetch up to $1,200 to $1,300 each on the black market.[23] According to a report released by the Federal Bureau of Investigation's ("FBI") Cyber Division, criminals can sell healthcare records for 50 times the price of a stolen Social Security or credit card number.[24]

---

[21] *See* Andrew Steager, *What Happens to Stolen Healthcare Data*, HEALTHTECH MAG. (Oct. 20, 2019), https://healthtechmagazine.net/article/2019/10/what-happens-stolen-healthcare-data-perfcon (quoting Tom Kellermann, Chief Cybersecurity Officer, Carbon Black, stating "Health information is a treasure trove for criminals.").

[22] *Id.*

[23] *See* SC Staff, *Health Insurance Credentials Fetch High Prices in the Online Black Market*, SC MAG. (July 16, 2013), https://www.scmagazine.com/news/breach/health-insurance-credentials-fetch-high-prices-in-the-online-black-market.

[24] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk for Increased Cyber Intrusions for Financial Gain* (April 8, 2014), https://www.illuminweb.com/wp-content/uploads/ill-mo-uploads/103/2418/health-systems-cyber-intrusions.pdf.

38.     Criminals can use stolen PII/PHI to extort a financial payment by "leveraging details specific to a disease or terminal illness."[25] Quoting Carbon Black's Chief Cybersecurity Officer, one recent article explained: "Traditional criminals understand the power of coercion and extortion . . . By having healthcare information—specifically, regarding a sexually transmitted disease or terminal illness—that information can be used to extort or coerce someone to do what you want them to do."[26]

39.     Consumers place a high value on the privacy of their data, as they should. Researchers shed light on how much consumers value their data privacy—and the amount is considerable. Indeed, studies confirm that "when privacy information is made more salient and accessible, some consumers are willing to pay a premium to purchase from privacy protective websites."[27]

40.     Given these facts, any company that transacts business with a consumer and then compromises the privacy of consumers' PII/PHI has thus deprived that consumer of the full monetary value of the consumer's transaction with the company.

---

[25] Steager, *supra* note 21.
[26] *Id.*
[27] Janice Y. Tsai et al., *The Effect of Online Privacy Information on Purchasing Behavior*, *An Experimental Study*, 22(2) Info. Sys. Rsch. 254 (June 2011) https://www.jstor.org/stable/23015560?seq=1.

### *Theft of PII/PHI Has Grave and Lasting Consequences for Victims*

41.    Theft of PII/PHI can have serious consequences for the victim. The FTC warns consumers that identity thieves use PII/PHI to receive medical treatment, start new utility accounts, and incur charges and credit in a person's name.[28] [29]

42.    Experian, one of the largest credit reporting companies in the world, warns consumers that "[i]dentity thieves can profit off your personal information" by, among other things, selling the information, taking over accounts, using accounts without permission, applying for new accounts, obtaining medical procedures, filing a tax return, and applying for government benefits.[30]

43.    Identity theft is not an easy problem to solve. In a survey, the Identity Theft Resource Center found that almost 20% of victims of identity misuse needed more than a month to resolve issues stemming from identity theft.[31]

44.    Theft of PII is even more serious when it includes theft of PHI. Data breaches involving medical information "typically leave[] a trail of falsified information in medical records

---

[28] *See* Federal Trade Commission, *What to Know About Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-identity-theft (last accessed Sept. 5, 2025).

[29] The FTC defines identity theft as "a fraud committed or attempted using the identifying information of another person without authority." 12 C.F.R. § 1022.3(h). The FTC describes "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, social security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 12 C.F.R. § 1022.3(g).

[30] *See* Louis DeNicola, *What Can Identity Thieves Do with Your Personal Information and How Can You Protect Yourself*, EXPERIAN (May 21, 2023), https://www.experian.com/blogs/ask-experian/what-can-identity-thieves-do-with-your-personal-information-and-how-can-you-protect-yourself/.

[31] Identity Theft Resource Center, *2023 Consumer Aftermath Report*, IDENTITY THEFT RES. CTR. (2023), https://www.idtheftcenter.org/publication/2023-consumer-impact-report/ (last accessed Sept. 5, 2025).

that can plague victims' medical and financial lives for years."[32] It "is also more difficult to detect, taking almost twice as long as normal identity theft."[33] In warning consumers on the dangers of medical identity theft, the FTC states that an identity thief may use PII/PHI "to see a doctor, get prescription drugs, buy medical devices, submit claims with your insurance provider, or get other medical care."[34] The FTC also warns, "If the thief's health information is mixed with yours it could affect the medical care you're able to get or the health insurance benefits you're able to use."[35]

45.    A report published by the World Privacy Forum and presented at the US FTC Workshop on Informational Injury describes what medical identity theft victims may experience:

> a.    Changes to their health care records, most often the addition of falsified information, through improper billing activity or activity by imposters. These changes can affect the healthcare a person receives if the errors are not caught and corrected.

> b.    Significant bills for medical goods and services neither sought nor received.

> c.    Issues with insurance, co-pays, and insurance caps.

> d.    Long-term credit problems based on problems with debt collectors reporting debt due to identity theft.

> e.    Serious life consequences resulting from the crime; for example, victims have been falsely accused of being drug users based on falsified entries to their medical files; victims have had their children removed from them due to medical activities of the imposter; victims have been denied jobs due to incorrect information placed in their health files due to the crime.

---

[32] Pam Dixon & John Emerson, *The Geography of Medical Identity Theft*, WORLD PRIV. F. (Dec. 12, 2017), http://www.worldprivacyforum.org/wp-content/uploads/2017/12/WPF_Geography_of_Medical_Identity_Theft_fs.pdf.

[33] *See* Federal Bureau of Investigation, *Health Care Systems and Medical Devices at Risk . . .*, *supra* note 24.

[34] *See* Federal Trade Commission, *What to Know About Medical Identity Theft*, FTC CONSUMER INFO., https://www.consumer.ftc.gov/articles/what-know-about-medical-identity-theft (last accessed Sept. 5, 2025).

[35] *Id.*

f.      As a result of improper and/or fraudulent medical debt reporting, victims may not qualify for mortgage or other loans and may experience other financial impacts.

g.      Phantom medical debt collection based on medical billing or other identity information.

h.      Sales of medical debt arising from identity theft can perpetuate a victim's debt collection and credit problems, through no fault of their own.[36]

46.    There may also be time lags between when sensitive personal information is stolen, when it is used, and when a person discovers it has been used. On average it takes approximately three months for consumers to discover their identity has been stolen and used, but it takes some individuals up to three years to learn that information.[37]

47.    It is within this context that Plaintiff and all other Class members must now live with the knowledge that their PII/PHI is forever in cyberspace and was taken by someone intending to use that information for any number of improper purposes and scams, including making the information available for sale on the black-market.

***Damages Sustained by Plaintiff and Class Members***

48.    Plaintiff and Class members have suffered and will suffer injury, including, but not limited to: (i) a substantially increased and imminent risk of identity theft; (ii) the disclosure, compromise, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with efforts attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in Defendant's possession;

---

[36] *See* Dixon & Emerson, *supra* note 32.
[37] John W. Coffey, *Difficulties in Determining Data Breach Impacts*, 17 J. OF SYSTEMICS, CYBERNETICS AND INFORMATICS 9 (2019),
 http://www.iiisci.org/journal/pdv/sci/pdfs/IP069LL19.pdf.

(vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

## **CLASS ALLEGATIONS**

49.     This action is brought and may be properly maintained as a class action pursuant to Fed. R. Civ. P. 23.

50.     Plaintiff brings this action on behalf of herself and all members of the following Class of similarly situated persons:

> All persons whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

51.     Plaintiff also brings this action on behalf of herself and all members of the following subclass of similarly situated persons (the "Kansas Subclass"):

> All persons residing in Kansas whose personally identifiable information or personal health information was accessed in the Data Breach by unauthorized persons, including all persons who were sent a notice of the Data Breach.

52.     Excluded from the Class are Healthcare Services Group, Inc., and its affiliates, parents, subsidiaries, officers, agents, and directors, as well as the judge(s) presiding over this matter and the clerks of said judge.

53.     Certification of Plaintiff's claims for class-wide treatment is appropriate because Plaintiff can prove the elements of her claims on a class-wide basis using the same evidence as would be used to prove those elements in individual actions alleging the same claims.

54.     The members in the Class are so numerous that joinder of each of the Class members in a single proceeding would be impracticable. HCSG reported to the Maine Attorney General that the Data Breach affected approximately 624,496 persons.[38]

55.     Common questions of law and fact exist as to all Class members and predominate over any potential questions affecting only individual Class members. Such common questions of law or fact include, *inter alia*:

a.  Whether Defendant had a duty to implement and maintain reasonable security procedures and practices to protect and secure Plaintiff's and Class members' PII/PHI from unauthorized access and disclosure;

b.  Whether Defendant had a duty not to disclose the PII/PHI of Plaintiff and Class members to unauthorized third parties;

c.  Whether Defendant failed to exercise reasonable care to secure and safeguard Plaintiff's and Class members' PII/PHI;

d.  Whether Defendant breached those duties to protect Plaintiff's and Class members' PII/PHI; and

e.  Whether Plaintiff and Class members are entitled to damages and the measure of such damages and relief.

56.     Defendant engaged in a common course of conduct giving rise to the legal rights sought to be enforced by Plaintiff, on behalf of herself and all other Class members. Individual questions, if any, pale in comparison, in both quantity and quality, to the numerous common questions that dominate this action.

57.     Plaintiff's claims are typical of the claims of the Class. Plaintiff, like all proposed members of the Class, had her PII/PHI compromised in the Data Breach. Plaintiff and Class members were injured by the same wrongful acts, practices, and omissions committed by

---

[38] *See Notice Letter*, *supa* note 10.

Defendant, as described herein. Plaintiff's claims therefore arise from the same practices or course of conduct that give rise to the claims of all Class members.

58.    Plaintiff will fairly and adequately protect the interests of the Class members. Plaintiff is an adequate representative of the Class in that she has no interests adverse to, or that conflict with, the Class she seeks to represent. Plaintiff has retained counsel with substantial experience and success in the prosecution of complex consumer protection class actions of this nature.

59.    A class action is superior to any other available means for the fair and efficient adjudication of this controversy, and no unusual difficulties are likely to be encountered in the management of this class action. The damages and other financial detriment suffered by Plaintiff and Class members are relatively small compared to the burden and expense that would be required to individually litigate their claims against Defendant, so it would be impracticable for Class members to individually seek redress from Defendant's wrongful conduct. Even if Class members could afford individual litigation, the court system could not. Individualized litigation creates a potential for inconsistent or contradictory judgments and increases the delay and expense to all parties and the court system. By contrast, the class action device presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single court.

## CAUSES OF ACTION

### COUNT I
### NEGLIGENCE

60.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

61.     HCSG owed a duty to Plaintiff and Class members to exercise reasonable care in safeguarding and protecting the PII/PHI it collected and shared.

62.     HCSG's duties arise from, *inter alia*, the HIPAA Privacy Rule ("Standards for Privacy of Individually Identifiable Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and E, and the HIPAA Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C (collectively, "HIPAA Privacy and Security Rules").

63.     HCSG's duties also arise from Section 5 of the FTC Act ("FTCA"), 15 U.S.C. § 45(a)(1), which prohibits "unfair . . . practices in or affecting commerce," including, as interpreted by the FTC, the unfair act or practice by business, such as Defendant, of failing to employ reasonable measures to protect and secure PII/PHI.

64.     HCSG violated HIPAA Privacy and Security Rules and Section 5 of the FTCA by failing to use reasonable measures to protect Plaintiff's and other Class members' PII/PHI, by failing to provide timely notice, and by not complying with applicable industry standards. HCSG's conduct was particularly unreasonable given the nature and amount of PII/PHI it obtains and shares, and the foreseeable consequences of a data breach involving PII/PHI including, specifically, the substantial damages that would result to Plaintiff and the other Class members.

65.     Plaintiff and Class members are within the class of persons that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to protect.

66.     The harm occurring as a result of the Data Breach is the type of harm that HIPAA Privacy and Security Rules and Section 5 of the FTCA were intended to guard against. The FTC has pursued enforcement actions against businesses, which, as a result of their failure

to employ reasonable data security measures and avoid unfair practices or deceptive practices, caused the same type of harm that has been suffered by Plaintiff and Class members as a result of the Data Breach.

67.     HCSG knew or should have known the risks of collecting, storing, and sharing Plaintiff's and all other Class members' PII/PHI. HCSG knew or should have known of the many data breaches that targeted entities that collect and share PII/PHI in recent years.

68.     Given the nature of HCSG's businesses, the sensitivity and value of the PII/PHI it collects and maintains, and the resources at its disposal, HCSG should have identified the vulnerabilities to its systems and prevented the Data Breach from occurring.

69.     HCSG breached these duties by failing to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems to safeguard and protect PII/PHI entrusted to them—including Plaintiff's and Class members' PII/PHI.

70.     It was reasonably foreseeable to HCSG that its failure to exercise reasonable care in safeguarding and protecting Plaintiff's and Class members' PII/PHI by failing to design, adopt, implement, control, direct, oversee, manage, monitor, and audit appropriate data security processes, controls, policies, procedures, protocols, and software and hardware systems would result in the unauthorized release, disclosure, and dissemination of Plaintiff's and Class members' PII/PHI to unauthorized individuals.

71.     But for HCSG's negligent conduct or breach of the above-described duties owed to Plaintiff and Class members, their PII/PHI would not have been compromised.

72.    As a result of HCSG's above-described wrongful actions, inaction, and want of ordinary care that directly and proximately caused the Data Breach, Plaintiff and Class members have suffered and will continue to suffer injury, including, but not limited to: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in HCSG's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

**COUNT II**
**BREACH OF IMPLIED CONTRACT**

73.    Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

74.    In connection with receiving healthcare services or employment, Plaintiff and all other Class members entered into implied contracts with HCSG.

75.    Pursuant to these implied contracts, Plaintiff and Class members paid money to HCSG, directly or through their insurance, or provided their labor to HCSG, and provided HCSG with their PII/PHI. In exchange, HCSG agreed to, among other things, and Plaintiff and Class members understood that HCSG would: (1) provide healthcare services or employment to Plaintiff and Class members; (2) collect, maintain, and utilize Plaintiff's and Class members' PII/PHI to, among other things, facilitate the provision of services  or employment to Plaintiff and Class members; (3) take reasonable measures to protect the security and

confidentiality of Plaintiff's and Class members' PII/PHI; (4) protect Plaintiff's and Class members' PII/PHI in compliance with federal and state laws and regulations, industry standards, and HCSG's representations; and (5) maintain the confidentiality of Plaintiff's and Class members' PII/PHI and protect it from unauthorized access, disclosure, theft, and misuse.

76.    The protection of PII/PHI was a material term of the implied contracts between Plaintiff and Class members, on the one hand, and HCSG, on the other hand. Had Plaintiff and Class members known that HCSG would not adequately protect its employees' and clients' patients' PII/PHI, they would not have agreed to provide HCSG with their PII/PHI or received employment or services from HCSG.

77.    Plaintiff and Class members performed their obligations under the implied contract when they provided HCSG with their PII/PHI and provided their labor to, or paid—directly or through their insurers—for services from, HCSG.

78.    HCSG breached its obligations under its implied contracts with Plaintiff and Class members in failing to implement and maintain reasonable security measures to protect and secure their PII/PHI and in failing to implement and maintain reasonable security protocols and procedures to protect Plaintiff's and Class members' PII/PHI in a manner that complies with applicable laws, regulations, industry standards, and HCSG's representations.

79.    HCSG's breach of its obligations of its implied contracts with Plaintiff and Class members directly resulted in the Data Breach and the injuries that Plaintiff and all other Class members have suffered from the Data Breach.

80.    Plaintiff and all other Class members were damaged by HCSG's breach of implied contracts because: (i) they paid—directly or through their insurers—for data security protection they did not receive; (ii) they face a substantially increased risk of identity theft and

medical theft—risks justifying expenditures for protective and remedial services for which they are entitled to compensation; (iii) their PII/PHI was improperly disclosed to unauthorized individuals; (iv) the confidentiality of their PII/PHI has been breached; (v) they were deprived of the value of their PII/PHI, for which there is a well-established national and international market; (vi) lost time and money incurred to mitigate and remediate the effects of the Data Breach, including the increased risks of identity theft they face and will continue to face; and (vii) overpayment for services that were received without adequate data security.

**COUNT III**
**UNJUST ENRICHMENT**

81.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

82.     This claim is pleaded in the alternative to the breach of implied contract claim.

83.     Plaintiff and Class members conferred a monetary benefit upon HCSG in the form of monies paid to HCSG for healthcare services or providing the value of their labor, and through the provision of their PII/PHI. Plaintiff and Class members did so with an implicit understanding that HCSG would use some of these payments or the value created by their labor to protect the PII/PHI it collects and use to provide services and employment.

84.     HCSG accepted or had knowledge of the benefits conferred upon it by Plaintiff and Class members. HCSG also benefitted from the receipt of Plaintiff's and Class members' PII/PHI, as this was used to facilitate their business operations and billing services.

85.     As a result of HCSG's conduct, Plaintiff and Class members suffered actual damages in an amount equal to the difference in value between their payments or labor made with reasonable data privacy and security practices and procedures that they paid for, and those payments without reasonable data privacy and security practices and procedures that they received.

86.     HCSG should not be permitted to retain the money belonging to Plaintiff and Class members because HCSG failed to adequately implement the data privacy and security procedures for themselves that Plaintiff and Class members paid for and that were otherwise mandated by federal, state, and local laws and industry standards.

87.     Plaintiff and Class members have no adequate remedy at law.

88.     HCSG should be compelled to provide for the benefit of Plaintiff and Class members all unlawful proceeds received by it as a result of the conduct and Data Breach alleged herein.

## COUNT IV
## VIOLATIONS OF THE KANSAS CONSUMER PROTECTION ACT
### K.S.A. §§ 50-623, *et seq.* ("KCPA")
### *On Behalf of the Kansas Subclass*

89.     Plaintiff realleges and incorporates by reference all preceding paragraphs as if fully set forth herein.

90.     Plaintiff brings this claim individually and on behalf of the Kansas Subclass.[39]

91.     K.S.A. § 50-626(a) states "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."

92.     HCSG is a supplier under the KCPA pursuant to K.S.A. § 50-624(l).

93.     The healthcare services that HCSG provided to Plaintiff and Class members are "consumer transactions" pursuant to K.S.A. § 50-624(c).

94.     The KCPA defines "services" to include, *inter alia*, "[w]ork, labor and other personal services." K.S.A. § 50-624(k). The services that HCSG provides are "services" within the meaning of K.S.A. § 50-624(k).

---

[39] As used in this claim, "Class members" refers to members of the Kansas Subclass.

95.     HCSG made representations to Plaintiff and Class members that their information would remain confidential, particularly in their Privacy Policy.

96.     HCSG did not disclose to Plaintiff and Class members that its data security was inadequate.

97.     HCSG committed deceptive acts or practices in violation of the KCPA through its failure to adequately safeguard and maintain Plaintiff's and Class members' PII/PHI.

98.     HCSG committed deceptive acts or practices by making at least the following representations regarding its data security with reason to know they were false:

    a.     property or services have sponsorship, approval, accessories, characteristics, ingredients, uses, benefits or quantities that they do not have (K.S.A. § 50-626(b)(1)(A));

    b.     property or services are of particular standard, quality, grade, style or model, if they are of another which differs materially from the representation (K.S.A. § 50-626(b)(1)(D)); and

    c.     property or services has uses, benefits or characteristics unless the supplier relied upon and possesses a reasonable basis for making such representation (K.S.A. § 50-626(b)(1)(F)).

99.     As a result of HCSG's above-described conduct, Plaintiff and Class members have suffered damages from the disclosure of their information to unauthorized individuals.

100.     The injury and harm that Plaintiff and the other Class members suffered was the direct and proximate result of HCSG's violations of the KCPA. Plaintiff and Class members have suffered (and will continue to suffer) economic damages and other injury and actual harm in the form of, *inter alia*: (i) a substantial increase in the likelihood of identity theft; (ii) the compromise, publication, and theft of their PII/PHI; (iii) out-of-pocket expenses associated with the prevention, detection, and recovery from unauthorized use of their PII/PHI; (iv) lost opportunity costs associated with effort attempting to mitigate the actual and future

consequences of the Data Breach; (v) the continued risk to their PII/PHI which remains in HCSG's possession; (vi) future costs in terms of time, effort, and money that will be required to prevent, detect, and repair the impact of the PII/PHI compromised as a result of the Data Breach; and (vii) overpayment for the services that were received without adequate data security.

101.    Plaintiff, individually and for each member of the Class, seeks damages for their injuries pursuant to K.S.A. § 50-634(d) and attorneys' fees, litigation expenses and court costs pursuant to K.S.A. § 50-634(e).

## **PRAYER FOR RELIEF**

Plaintiff, individually and on behalf of all other members of the Class, respectfully requests that the Court enter judgment in her favor and against Defendant as follows:

A.    Certifying the Class as requested herein, designating Plaintiff as Class Representative, and appointing Plaintiff's counsel as Class Counsel;

B.    Awarding Plaintiff and the Class appropriate monetary relief, including actual damages, statutory damages, punitive damages, restitution, and disgorgement;

C.    Awarding Plaintiff and the Class equitable, injunctive, and declaratory relief, as may be appropriate. Plaintiff, on behalf of herself and the Class, seeks appropriate injunctive relief designed to prevent Defendant from experiencing another data breach by adopting and implementing best data security practices to safeguard PII/PHI and to provide or extend credit monitoring services and similar services to protect against all types of identity theft and medical identity theft;

D.    Awarding Plaintiff and the Class pre-judgment and post-judgment interest to the maximum extent allowable;

E.    Awarding Plaintiff and the Class reasonable attorneys' fees, costs, and expenses, as allowable; and

F.    Awarding Plaintiff and the Class such other favorable relief as allowable under law.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury of all claims in this Class Action Complaint so triable.

Dated: September 5, 2025                    Respectfully submitted,

*/s/ Kenneth Grunfeld*
Kenneth Grunfeld
PA Bar # 84121
**KOPELOWITZ OSTROW P.A.**
65 Overhill Road
Bala Cynwyd, PA 19004
Tel: 954.525.4100
grunfeld@kolawyers.com

Ben Barnow*
Anthony L. Parkhill*
**BARNOW AND ASSOCIATES, P.C.**
205 West Randolph Street, Suite 1630
Chicago, IL 60606
Tel: 312.621.2000
Fax: 312.641.5504
b.barnow@barnowlaw.com
aparkhill@barnowlaw.com

*Counsel for Plaintiff*

**Pro hac vice* forthcoming